UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

EDWIN J. SWANN, *et al.*,

    Plaintiffs,

vs.

TIME WARNER ENTERTAINMENT
COMPANY, L.P.,

    Defendant.

Case No. 3:13-cv-42

Magistrate Judge Michael J. Newman
(Consent Case)

---

**DECISION AND ENTRY: (1) GRANTING DEFENDANT'S MOTIONS FOR
SUMMARY JUDGMENT (DOCS. 47, 49, 50, 51, 52, 53, 54); (2) DENYING
DEFENDANT'S MOTION TO STRIKE EXPERT TESTIMONY AS MOOT (DOC. 48);
AND (3) TERMINATING THIS CASE ON THE COURT' S DOCKET**

---

This is an employment discrimination consent case brought by seven African American former employees of Defendant Time Warner Entertainment Company, L.P. ("TWC"). Plaintiffs seek relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the corresponding provision of Ohio law, Ohio Rev. Code § 4112.02(A).  *See* doc. 4 at PageID 42-46.  Racial discrimination claims brought under these two statutes are analyzed under the same legal framework.  *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 n.3 (6th Cir. 2015); *Laughlin v. City of Cleveland*, No. 15-3486, 2015 WL 8290037, at *2 (6th Cir. Dec. 9, 2015) (per curiam).

Following the discovery deadline, during which the parties engaged in extensive and significant discovery efforts over approximately two years, TWC moved for summary judgment on all of Plaintiffs' claims -- namely, claims alleging race discrimination on both disparate

treatment[1] and disparate impact theories.  *See* docs. 47, 49, 50, 51, 52, 53, 54.  Plaintiffs filed memoranda in opposition to the summary judgment motions.  Docs. 57, 59.  TWC then filed reply memoranda.  Docs. 61, 63, 64, 65, 66, 67, 68.  In addition to the motions for summary judgment, TWC filed a motion to strike the testimony of Plaintiffs' expert witness, Richard Stock, Ph.D. (doc. 48), to which Plaintiffs filed a memorandum in opposition (doc. 58), and TWC filed a reply (doc. 62).  These motions are now ripe for review.

In conducting its summary judgment review, the Court has extensively and carefully reviewed all of the foregoing documents, as well as all of the Rule 56 evidence cited by the parties.  The Court stresses the seriousness with which it has undertaken this review -- as it does in all cases involving allegations of racial or any other form of alleged discrimination.  Following this careful and exhaustive review, the Court finds that Plaintiffs, even when all of the facts are viewed in the light most favorable to them, have failed to satisfy their *prima facie* burden regarding both their disparate treatment and disparate impact claims.[2]

## I.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v.*

---

[1] The Court notes at the outset that, in their complaint, Plaintiffs characterized their disparate treatment causes of action as claims for "wrongful termination."  Doc. 4 at PageID 44-46 (alleging that TWC "discriminated against [them] by discharging and otherwise adversely impacting their compensation, terms, conditions, and privileges of employment, because of their race").  In opposing summary judgment, Plaintiffs no longer argue disparate treatment arising from their termination -- in fact, Plaintiff Tony Murphy was, without dispute, not terminated at all.  *See* doc. 59 at PageID 3774-76.  Instead, Plaintiffs now focus on the denial of numerous "special request orders" and particular work assignments as the basis of their disparate treatment claims.  *Id.* at PageID 3774-76.

[2] Accordingly, the Court does not here address whether or not TWC has shown a legitimate, non-discriminatory reason for any adverse employment action against Plaintiffs, or whether -- with regard to Plaintiffs' disparate impact claims -- any challenged business practice was a business necessity.  *White*, *infra*, 533 F.3d at 391; *Howe*, *infra*, 723 F.3d at 658.

*Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment -- rather, all facts must be viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment has a shifting burden and "must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." *Id.* (citation omitted). Failure "to properly address another party's assertion of fact as required by Rule 56(c)" could result in the Court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "[i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome." *Id.* at 406. In other

words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id.*

## II.

The parties, in briefing the issues presented on summary judgment, point to excerpts of Plaintiffs' deposition testimony, as well as a significant number of authenticated TWC business records. *See* docs 47-1 at PageID 1130-31; doc. 47-44 at PageID 2751-53; doc. 59-1 at PageID 3784-85. In opposing TWC's motion for summary judgment on the disparate impact claims, Plaintiffs rely on the evidence submitted by TWC in support of their arguments. *See* doc. 57. In opposing TWC's motions concerning Plaintiffs' disparate treatment claims, Plaintiffs rely on their deposition testimony. *See* doc. 59-1 at PageID 3784-85. Except where otherwise noted, the following summary of the evidence sets forth the material undisputed facts, as well as the disputed facts viewed in the light most favorable to Plaintiffs.

### A.    Background

Plaintiffs, all of whom are African American, worked for TWC as customer service technicians ("CSTs") at TWC's Turner Road location in Dayton, Ohio. Doc. 47-44 at PageID 2754. In 2009, TWC implemented the "Start From Home" ("SFH") program, which permitted CSTs to travel home in TWC vans at the end of the work day, and to travel in the same TWC vans directly from their homes to their service assignments the next day. Doc. 47-44 at PageID 2754. SFH was a program TWC used throughout the country, not just at the Turner Road location in Dayton.[3] *See* doc. 47-21 at PageID 1868. Although CSTs were automatically subject to SFH, they were also able to opt out of SFH. Doc. 47-64 at PageID 3183. The parties point to

---

[3] Although SFH is a nationwide program used by TWC, Plaintiffs do not assert that SFH disparately impacted African American CSTs throughout the United States and, instead, assert only that the policy had a disparate impact as it applied to CSTs at the Turner Road location in Dayton, Ohio. *See* doc. 4 at PageID 44-46; doc. 57 at PageID 3635-36. The Court's research has revealed no other case in the United States wherein the SFH policy has been challenged as discriminatory.

no evidence that any individual CST's opt out request was ever denied by TWC. Doc. 47-44 at PageID 2755-56.

All Plaintiffs in this case were participants in SFH. Doc. 47-44 at PageID 2756. Although TWC points to evidence that SFH was not designed to route CSTs to work in areas near their homes -- and SFH policy documents state that "[t]he program does not necessarily imply that the employee will be routed to work near their home[,]" *see* doc. 47-64 at PageID 3182 -- Plaintiffs testify that, in practice, CSTs would be predominately routed to jobs near their own home throughout the day. *See* doc. 47-2 at PageID 1163-64; doc. 47-3 at PageID 1211-12; doc. 47-4 at PageID 1253; doc. 47-7 at PageID 1345-46; doc. 47-12 at PageID 1533-34; doc. 47-15 at PageID 1708; doc. 47-24 at PageID 2014-15; doc. 47-29 at PageID 2220, 2241; doc. 47-32 at PageID 2348-49. Although Plaintiffs point to no evidence regarding where they lived during their employment with TWC, they point to evidence that African American CSTs predominately lived in lower income areas in Dayton where, according to Plaintiffs, those CSTs faced certain obstacles not prevalent in more affluent communities -- namely, outdated infrastructure, unkempt vegetation, and higher rates of cable theft and vandalism. *See* doc. 57 at PageID 3635-36. Because of these alleged obstacles, Plaintiffs contend that their performance and efficiency were negatively affected, and they were often called back to a job to complete more work. *Id*.

To gauge the work performance of each CST, TWC used certain performance metrics -- namely "Service Repeat Rates" and "Productivity Ratings" -- to evaluate the productivity and efficiency of CSTs. Doc. 47-44 at PageID 2758. The Service Repeat Rate was based on the frequency of customer callbacks -- *i.e.*, a "service repeat," which involved a CST performing follow-up service after the initial service call. *Id*. The Service Repeat Rate was designed to measure the quality and thoroughness of each CST's service. *Id*. Productivity Ratings were

based on a system designed to measure CST efficiency by assigning a certain point value to each potential work order ("points-per-hour" rate). *Id.* The point value for each individual work order was an estimate of how long each job should take based upon past performance of all CSTs performing similar work for past customers. Doc. 47-36 at PageID 2530-31. Simpler work orders had lower point values, whereas more difficult work orders were given higher point values because they required more time. *See id.*

If a CST made a "Special Request Order" (hereinafter referred to as a "SRO"), performance metrics could be adjusted by a supervisor, manager on duty, or CSTs working as Tech Assists.[4] Doc. 47-2 at PageID 1170-1; doc. 47-3 at PageID 1172-75. If a SRO was approved, the point value given a particular work order could be changed, or a follow up request for services could be entered as a new work order (which would avoid a service repeat call). Doc. 47-44 at PageID 2758. According to Plaintiffs, Caucasian CSTs at the Turner Road location were granted SROs more frequently than African American CSTs. Doc. 59-2 at PageID 3791; doc. 59-3 at PageID 3825-30.

If CSTs failed to meet the minimum requirements of TWC's performance metrics, TWC had progressive disciplinary procedures. Doc. 47-44 at PageID 2760. Effective June 2009, the minimum productivity score standard for a CST at the Turner Road location was 10 points per hour. Doc. 47-63 at PageID 3167. Under TWC's progressive disciplinary procedures at that time, a CST received the following discipline if he or she failed to achieve the required productivity score in a rolling 12 month period: (1) a verbal warning if his/her productivity score was below 10 points for 2 months, or below 9 points for 1 month; (2) a written warning if his/her productivity score was below 10 points for 3 months, or below 9 points for 2 months; (3) a final

---

[4] "Tech Assists" are CSTs who provide assistance to customers by telephone rather than in the field. Doc. 59-2 at PageID 3784; doc. 59-4 at PageID 3835; doc. 59-5 at PageID 3864-3866; doc. 59-8 at PageID 3936; doc. 59-7 at PageID 3885; doc. 59-6 at PageID 3872.

written warning if his/her productivity score was below 10 points for 4 months, or 9 points for 3 months; and (4) a recommendation for termination if his/her productivity score was below 10 points for 5 months, or 9 points for 4 months.  *Id.*

Effective July 2010, the minimum productivity score standard for a CST at the Turner Road location was changed to 9.5 points per hour.  *Id* at PageID 3166.  Thereafter, a CST received the following discipline if he or she failed to achieve the required productivity score in a rolling 12 month period: (1) a verbal warning if his/her average hourly productivity score was below 9.5 points for 1 month; (2) a written warning if his/her productivity score was below 9.5 points for 2 months; (3) a final written warning if his/her productivity score was below 9.5 points for 3 months; and (4) a recommendation for termination if his/her productivity score was below 9.5 points for 4 months.  Doc. 47-63 at PageID 3166.

CSTs were automatically ineligible for transfer or promotion for six months after receiving any disciplinary action, including a verbal warning.  Doc. 47-64 and 47-65 at PageID 3192-07.  Plaintiffs were each disciplined for failing to meet performance metrics requirements; all but two were eventually terminated by TWC.  Doc. 47-72 at PageID 3419.

### B.    Individual Plaintiffs

The seven Plaintiffs are Edwin Swann, Charles Bryant, Clarence Harper, Jerome Turner, Matthew Massey, Sylvan Vaughn, and Tony Murphy.[5]

Edwin Swann began his employment with TWC in August 2007 as a cable installer.  Doc. 47-24 at PageID 1995.  Within a year, he was promoted to the position of CST.  Doc. 47-24 at PageID 2004-06.  From July 2009 through February 2010, Swann received verbal, written, and

---

[5] TWC details the disciplinary history of each Plaintiff.  Doc. 47 at PageID 1118-19; doc. 49 at PageID 3517-18; doc. 50 at PageID 2526-37; doc. 51 at PageID 3554-55; doc. 52 at PageID 3573-74; doc. 53 at PageID 3595-96; doc. 54 at PageID 3615-16.  Plaintiffs cite no Rule 56 evidence rebutting these factual assertions.  *See* doc. 59.

final warnings for his failure to meet service repeat standards.[6] Doc. 47-28 at PageID 2171, 2173, 2175, 2182. TWC terminated Swann from employment effective August 20, 2011 on that basis. Doc. 47-28 at PageID 2176.

Charles Bryant worked as a CST for TWC. Doc. 47-4 at PageID 1234. Throughout 2009, Bryant had low productivity scores and received counseling and training as a result. Doc. 47-5 at PageID 1285-1289. After his performance continually failed to satisfy TWC's productivity standards, Bryant was terminated effective May 6, 2010.[7] *Id.* at PageID 1334; *see also* doc. 47-65 at PageID 3208.

Clarence Harper worked as a Senior CST for TWC.[8] Doc. 47-7 at PageID 1340, 1348-1349. From late 2010 through July 2011, he received counseling, a written warning, and a final written warning for issues related to his work performance and failure to follow TWC's Installation Guidelines. Doc. 47-9 at PageID 1433-44; doc. 47-11 at PageID 1503-10. On August 19, 2011, he was terminated after an inspection of one of his jobs revealed that he failed to follow TWC's Installation Guidelines. Doc. 47-9 at PageID 1432; *see also* doc. 47-11 at PageID 1503-10.

Jerome Turner was a CST who, in April 2007, September 2009, and March 2010, received verbal warnings for failing to meet productivity standards. Doc. 47-29 at PageID 2211-13, 2191. Turner then received written and final written warnings in May and June 2010. *Id.* TWC terminated Turner's employment effective August 5, 2010 as a result of his failure to meet productivity standards. Doc. 47-31 at PageID 2310-11; doc. 47-66 at PageID 3267.

---

[6] Earlier, in October 2008, Swann received a final written warning for his failure to comply with TWC's driving policies. Doc. 47-26 at PageID 2124-25. In February 2009, he was verbally counseled for excessive absences, and he received a written warning for such conduct in July 2009. Doc. 47-26 at PageID 2125-2126.

[7] Plaintiffs cite no evidence concerning Bryant's start date with TWC. *See doc.* 57 at PageID 3638.

[8] Plaintiffs cite no evidence concerning Harper's start date with TWC.

Matthew Massey, a TWC CST, was terminated from employment effective June 3, 2010 because of his failure to meet productivity standards.  Doc. 47-14 at PageID 1660; doc. 47-44 at PageID 2752, 2753, 2766-67.

Sylvan Vaughn began his employment with TWC in March 2007 as an installation technician.  Doc. 47-32 at PageID 2315.  Two years later, Vaughn was promoted to CST.  *Id.* at PageID 2316, 2320.  In late 2009 and early 2010, Vaughn had low productivity scores and received counseling and training.  Doc. 47-35 at PageID 2484.  Vaughn was terminated effective May 4, 2010 for his continued failure to meet minimum productivity standards.  *Id.*

Tony Murphy began his employment at TWC in August 2007 as a cable installer and was promoted to CST after approximately one year.  Doc. 47-15 at PageID 1672-75.  Murphy resigned in March 2012, and there is no assertion that he was constructively discharged.  *Id.* at PageID 1676-77.  Before resigning his employment at TWC, Murphy received two written warnings for failing to meet service repeat standards.  *Id.* at PageID 1687-1699; doc. 47-18 at PageID 1803-09; doc. 47-44 at PageID 2768.

### III.

The Court first addresses Plaintiffs' disparate treatment claims.  Absent direct evidence of discrimination, race discrimination claims are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Carson v. Patterson Cos., Inc.*, 423 F. App'x 510, 513 (6th Cir. 2011).  Under this framework, Plaintiffs bear the initial "burden of establishing a *prima facie* case of race discrimination[.]"  *Id.*  To do so, each Plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."  *White v. Baxter Healthcare*

*Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted). If Plaintiffs successfully demonstrate a *prima facie* case of discrimination, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (citation omitted). "[I]f the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391-92.

Notably, in the complaint in this case, each Plaintiff set forth disparate treatment claims titled, "[w]rongful [t]ermination in violation of [Ohio Rev. Code §] 4112.02 Title VII[,]" in which they each allege that TWC "discriminated against [them] by discharging and otherwise adversely impacting their compensation, terms, conditions, and privileges of employment, because of their race." Doc. 4 at PageID 44-46. Based upon such allegations, TWC moved for summary judgment arguing that, because Plaintiffs titled their claim "wrongful termination," "the only 'adverse action' at issue in this case is . . . termination." Doc. 49 at PageID 3524. In their motion for summary judgment, TWC asserts that Plaintiffs cannot satisfy their *prima facie* case of wrongful termination at the fourth step of the *McDonnell Douglas* test because they do not identify any similarly situated, non-protected employee that kept their job despite engaging in the same or similar conduct. *See* doc. 49 at PageID 3525-26.

Plaintiffs do not respond to TWC's arguments concerning their failure to make a *prima facie* case of race discrimination arising from their individual terminations and, in fact, make no effort to identify any similarly situated, non-protected employee that kept his or her job despite similar circumstances (or show that they were replaced by someone outside the protected class). *See* doc. 59 at PageID 3774-79. Accordingly, Plaintiffs have abandoned their wrongful

termination claims[9] and waived any argument concerning dismissal of such claims. *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (finding that "[t]he district court properly declined to consider the merits of [plaintiff's] claim because [plaintiff] failed to address it in . . . his response to the summary judgment motion"); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (holding that the district court properly concluded that plaintiff abandoned claims where his opposition to summary judgment "did not properly respond to the arguments asserted" by defendant); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19, 24 (6th Cir. 2003) (concluding that plaintiff abandoned a claim where he "failed to brief the issue before the district court"). Further, having failed to satisfy their burden of demonstrating a *prima facie* case at the fourth step of the *McDonnell Douglas* test, Plaintiffs' disparate treatment claims arising from their terminations must fail on the merits.

Instead of pursuing disparate treatment claims arising from their terminations, as was pled in the complaint, Plaintiffs now argue they suffered adverse employment actions when TWC: (1) denied their individual SRO requests; and (2) failed to individually consider them for Tech Assist assignments. Doc. 59 at PageID 3775-76. In reply, TWC, among other arguments, asserts that such actions are *de minimis* and do not constitute adverse employment actions. *See, e.g.*, doc. 61 at PageID 4293-94, 4296. TWC argues that Plaintiffs fail to allege disparate treatment claims on such basis in their complaint. *See, e.g.*, doc. 61 at PageID 4288-09. Plaintiffs do reference SROs and Tech Assist positions in their complaint, *see* doc. 4 at PageID 44-45, and, as a result, the Court, acting in the interest of justice, assumes this alleged conduct was properly pled by Plaintiffs.

---

[9] Plaintiff Murphy's wrongful termination claims fails for the additional reason that it is undisputed he was not terminated. *See supra* § II(C).

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 798 (6th Cir. 2004) (citation omitted).  "[D]e minimis employment actions are not materially adverse and, thus, not actionable." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)). "The employment action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 565 (6th Cir. 2012) (citation omitted).

### A.    Denial of SRO Requests

As set forth above, a SRO is an employee request to adjust TWC's estimate (1) regarding the difficulty of each individual work order or (2) to account for additional services requested by customers that were not contemplated by the original work order.  *See* doc. 59 at PageID 3771. Each Plaintiff in this case, without dispute, made numerous SRO requests during their employment, not one of which is detailed by Plaintiffs in their summary judgment briefing.  *See generally* doc. 59 at PageID 3772, 3775-78.  Plaintiffs' testimony supports a contention that such requests were routinely made by CSTs.  *See* doc. 59-3 at PageID 3812 (wherein Plaintiff Swann testified that he asked for "at least" 200 SROs during his employment).  Nevertheless, Plaintiffs argue that each denial of a SRO request, "[w]hile not an 'ultimate employment decision,' . . . was materially adverse to [their] work and constitutes [an] adverse employment action" because these denials "forced [them] to complete lengthy, difficult jobs without receiving appropriate credit for the work performed."  Doc. 50 at PageID 3775.

Plaintiffs cite no case law supporting their contention that an adverse employment action occurs whenever an employer denies routine requests to adjust job performance metrics.  Nor has the Court found such caselaw in its own research.  Cases in this Circuit hold that written discipline and negative performance reviews do not amount to adverse employment actions where unaccompanied by a materially adverse change in the terms and conditions of a plaintiff's employment.  *See Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 597 (6th Cir. 2009); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999); *Dowell v. Rubin*, No. 99-4184, 2000 WL 876767, at *2 (6th Cir. June 23, 2000).  The mere fact that a low score for a particular job, in which a SRO was requested and denied, ultimately factored, weeks or months thereafter, into Plaintiffs' overall performance metrics, and subsequently factored into a lack of promotion or termination, does not render the SRO denial, in and of itself, an adverse employment action as a matter of law.  *See McGinnis v. U.S. Air Force*, 266 F. Supp. 2d 748, 768 (S.D. Ohio 2003) (rejecting plaintiff's argument that an unfavorable performance evaluation "constituted an adverse employment action" merely "because it formed the basis for the subsequent failure to be considered for promotion").

### B.    Selection for Tech Assist Assignments

Plaintiffs next claim they experienced one or more adverse employment actions when TWC failed to choose them, and selected other CSTs to serve as Tech Assists.  Doc. 59 at PageID 3771.  Plaintiffs contend the Tech Assist position was more desirable -- not because of the title, pay, hours, benefits, power, or prestige -- but because duties were performed "in the office rather than in the field, so Tech Assists avoided braving the elements and being measured by productivity or service repeat scores in the same manner of as other CSTs" in the field.  *See* doc. 59 at PageID 3771-72.

Such "subjective impression[s] concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Mitchell*, 389 F.3d at 183 (finding no evidence of an adverse employment action, despite "plaintiff's subjective impression concerning desirability of one position over another," in the absence of "an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits").  TWC cites specific evidence that CSTs were given Tech Assist duties only temporarily, *i.e.*, "for approximately 90 days," and affirmatively states, without opposition by Plaintiffs, that "the assignment did not result in an increase in salary or a change in work hours."  Doc. 61-1 at PageID 4303.  Failure to obtain temporary work assignments with no increase in salary and no change in work hours does not amount to an adverse employment action. *See Hillman v. Green Bay Packaging, Inc.*, No. 1:05-CV-320, 2006 WL 3524385, at *13 (S.D. Ohio Dec. 6, 2006) (finding no "adverse employment action by not acquiring the temporary assignments"); *see also Berryman v. SuperValu Holdings, Inc.*, No. 3:05CV169, 2010 WL 1257836, at *13 (S.D. Ohio Mar. 31, 2010).  Plaintiffs cite no authority to the contrary. *See* doc. 59 at PageID 3776.

Accordingly, the Court finds that Plaintiffs have not met their burden to show, under the fourth prong of the *McDonnell Douglas prima facie* test, that they suffered an adverse employment action by being denied SROs or Tech Assist assignments.  Accordingly, TWC's motions for summary judgment on Plaintiffs' individual disparate treatment claims are **GRANTED**.

## IV.

The Court next addresses Plaintiffs' disparate impact claims.  Unlike disparate treatment claims, disparate impact claims assert discrimination arising from an employer's overall

employment practices, "whatever the employer's motives[,]" *Davis v. Cintas Corp.*, 717 F.3d 476, 494 (6th Cir. 2013), and often seek to "penalize employment practices that are 'fair in form but discriminatory in practice.'" *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005) (citing *Griggs v. Duke Power Co.*, 410 U.S. 424, 431 (1971)). Thus, disparate impact claims allow individuals to ensure "that employers do not use 'neutral' decision-making mechanisms that work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups." *Id.*

"A *prima face* case [of disparate impact discrimination] is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group." *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005). Upon Plaintiffs' successful demonstration of a *prima facie* case, "the burden shifts to the defendant-employer to show that the practice in question is a 'business necessity.'" *Howe v. City of Akron*, 723 F.3d 651, 658 (6th Cir. 2013) (citation omitted). "If the defendant demonstrates business necessity, the burden returns to the plaintiff to show that there are alternative practices without a similarly undesirable discriminatory effect, which would also serve the employer's legitimate interest." *Id.*

TWC argues that Plaintiffs fail to meet their burden with respect to both prongs of their *prima facie* case. Doc. 47 at PageID 1106-15.

### A.    Plaintiffs' *Prima Facie* Case

With regard to the first prong, Plaintiffs bear the burden of identifying "'a particular employment practice' that 'caused a significant adverse effect on a protected group.'" *Howe*, 723 F.3d at 658 (citation omitted); *see also* 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988) (holding that "plaintiff is . . . responsible for

isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities").  "This specific-practice requirement is important because isolating and identifying such practices 'is not a trivial burden,' and involves more than simply 'point[ing] to a generalized policy that leads to such an impact.'"  *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 403 (6th Cir. 2008) (citing *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100 (2008) & *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 239 (2005)); *see also Howe*, 723 F.3d at 658.  "[F]ailure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances."  *Smith*, 544 U.S. at 241.

TWC argues that Plaintiffs' allegations of disparate impact touch on any number of employment practices and, therefore, their claims fail because they do not isolate a particular employment practice that caused the alleged disparate impact.  Doc. 47 at PageID 1108-10.  The phrase "particular employment practice" comes from 42 U.S.C. § 2000e-2(k)(1), which states:

> An unlawful employment practice based on disparate impact is established
> . . . if . . . a complaining party demonstrates that a respondent uses *a
> particular employment practice* that causes a disparate impact on the basis
> of race . . . and the respondent fails to demonstrate that the challenged
> practice is job related for the position in question and consistent with
> business necessity . . ."

(emphasis added).  In pinpointing the "particular employment practice" at issue, the Sixth Circuit holds that plaintiffs "must identify one specific step . . . as a particular employment practice, rather than pointing to a group of steps[.]"  *Davis v. Cintas Corp.*, 717 F.3d 476, 496 (6th Cir. 2013).

Plaintiffs allege in the complaint that "one or more employment practices" led to a disparate impact, including the following:

> [T]he "Start from Home" program [] whereby Plaintiffs and other African American technicians were consistently assigned service calls and routes in the predominately African American and minority neighborhoods mainly in the westernmost neighborhoods of the City of Dayton, the City of Trotwood, and Englewood, Ohio."
>
> . . .
>
> [T]he policy by which an employee became eligible for raises, bonuses, promotions, and career advancement if they had received a warning for job performance [] that caused Plaintiffs and other African American technicians not to be promoted and not to receive bonuses or raises.
>
> . . .
>
> [T]he policy that required inflexible and automatic discipline, warnings, and termination if certain performance criteria were not met[] that caused [TWC] to proceed with automatic and dogmatic discipline and termination of other African American technicians without any consideration or analysis of whether its employment standards were appropriate under the circumstances of Plaintiffs' employment.

Doc. 4 at PageID 42-43. Plaintiffs assert that these various "employment policies . . . caused a disparate impact and disproportionately disqualified Plaintiffs and other African American technicians of employment opportunities." Doc. 4 at PageID 44.

Now, following discovery, Plaintiffs -- through their expert, Dr. Stock -- identify a disparity between the productivity scores of African American CSTs and Caucasian CSTs at Turner Road. *See* doc. 47-23 at PageID 1973. Dr. Stock concludes that between September 2009 and March 2012, African Americans CSTs at the Turner Road location had an average productivity score of 10.9, whereas Caucasian CSTs at Turner Road had an average productivity score of 11.9, *i.e.*, African American CSTs' productivity score was, on average, about 91.5% of the average Caucasian CST's productivity score. Doc. 47-23 at PageID 1977. Notably, both averages are above the threshold for discipline under TWC's policies. *See* doc. 47-63 at PageID 3166-67. Dr. Stock also found that nearly 80% of all African American CSTs during that time

period lived in nine purportedly less affluent ZIP codes, while only 11.7% of Caucasian CSTs lived in those same ZIP codes -- leading to his conclusion that a CST's place of residence is "a significant factor in the lower productivity scores for African American TWC technicians." *Id.* at PageID 2962.

In opposing TWC's motion for summary judgment on the disparate impact claim, Plaintiffs state that they identify SFH, and SFH alone, as the cause of the disparity in productivity scores. Doc. 57 at PageID 3641-43. Substantively, however, Plaintiffs' arguments attribute such disparity to other policies and practices, namely -- as set forth above -- that the frequent denial of SROs requested by African American CSTs also impacts performance metrics. *See* doc. 59 at PageID 3775; *see also* doc. 59-8 at PageID 3935 (wherein Plaintiff Massey, when asked "how . . . being denied SROs . . . affect[ed] [his] employment[,]" testified that "[i]t caused my production to be low"). In addition, Plaintiffs contend that TWC's estimate for the amount of time these difficult jobs should take in less affluent communities was too low, and that these difficult jobs should have been allocated more productivity points at the outset. *See* doc. 59 at PageID 3775 (arguing that Plaintiffs were "forced . . . to complete lengthy, difficult jobs without receiving appropriate credit for the work performed").

Thus, in addition to the practice of routing technicians to jobs near their own home as part of SFH, two other factors are implicated in determining the disparity in productivity scores: (1) the initial determination of points allocated to each job; and (2) the denial of SROs. Plaintiffs' expert, Dr. Stock, never undertook "any efforts to determine what other factors[,]" aside from SFH, might have caused the marginal disparity in productivity metrics, *see* doc. 58-1 at PageID 3712, and therefore, they have made "no effort to isolate any of these practices or to examine their individual effects" on the determination of a CST's productivity score. *See Grant*,

466 F. App'x at 740. Accordingly, Plaintiffs' disparate impact claims must fail as a result of their failure "to identify and isolate the effects of each specific employment practice" that impacted each CST's performance metrics. *See id.*; *see also Davis*, 717 F.3d at 496-97.[10]

Having concluded that Plaintiffs fail to satisfy the first element of a *prima facie* case of disparate impact discrimination, the Court need not address whether the statistical evidence presented by Plaintiff -- in the form of Dr. Stock's opinion -- is sufficient proof of an adverse impact for summary judgment purposes. In that regard, the Court need not address TWC's motion to strike Dr. Stock's opinion. *See* doc. 48. The Court does note that Dr. Stock's opinion appears to have a number of flaws -- as outlined extensively in TWC's motion to strike, *see* doc. 48[11] -- but expresses no opinion as to whether such alleged flaws render the opinion excludable pursuant to *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), or whether "such flaws relate to the weight of the reports which is a matter for the trier of fact." *Phillips*, 400 F.3d at 400-01.

The Court further notes that Plaintiffs point to no statistical evidence supporting their allegation that African American CSTs were disproportionately subjected to discipline for their individual or collective failure to meet performance metrics (and were thus disproportionately ineligible for promotion opportunities). *See* doc. 4 at PageID 44; doc. 57 at PageID 3643. Plaintiffs do point to evidence showing that, between January 2010 and August 2011, Massey, Bryant, Turner, Vaughn, and Swann were terminated -- *i.e.*, had been disciplined up to four times

---

[10] Plaintiffs have made no argument that the elements impacting their productivity scores "are not capable of separation for analysis," as is required by 42 U.S.C. § 2000e-2(k)(1)(B)(i). *See Grant*, 446 F. App'x at 740-41; *Davis*, 717 F.3d at 497-98.

[11] The Court notes that the sample size analyzed by Dr. Stock in rendering his opinion may be inappropriately limited in that -- although SFH was a nationwide practice by TWC -- he looked only at SFH's purported impact in Dayton, Ohio, as opposed to its impact nationwide. As recently held in this District, in the absence of evidence that the challenged employment practice is "handled any differently in [Dayton] than it [is] [nationwide]," it is "appropriate to view the 'total group'" of persons impacted by the practice "in order to examine whether the policy had a disproportionate impact." *Waldon v. Cincinnati Pub. Sch.*, 89 F. Supp. 3d 944, 949 (S.D. Ohio 2015).

each -- because of their failure to meet performance metrics, as opposed to only two Caucasian technicians who were then terminated for those same reasons.  *See* doc. 47-72 at PageID 3419. Ineligibility for promotion, however, occurred upon being disciplined only once, and Plaintiffs point to no evidence showing a disparity in the number of African American CSTs eligible for promotion during any specific time period versus the number of Caucasian CSTs ineligible for promotion during that same period.

### B.     Opting Out of SFH

Aside from all of the foregoing, the Court also concludes as a matter of law that Plaintiffs' participation in SFH cannot form the basis of a disparate impact claim.  TWC, in its motion for summary judgment, points to the fact that all CSTs are able to voluntarily opt out of participating in SFH; no CST was ever required to participate in the SFH program; and none of the Plaintiffs in this case ever sought to opt out of the program at any time.  *See* doc. 47 at PageID 1096.  In fact, TWC presents testimony that no opt out request has ever been denied.  *See* doc. 47-44 at PageID 2755-56.  The question, then, is whether a disparate impact claim can arise from a non-mandatory employment practice.  The Court finds that it cannot.

In support of the contention that participation in an optional program cannot form the basis of a disparate impact claim, TWC cites the case of *Bacon v. Honda of Am. Mfg.*, 370 F3d 565, 578 (6th Cir. 2004).  In *Bacon*, the employer had a policy that made employees ineligible for "promotion for 12 months after transferring from one department to another."  *Id*.  Plaintiffs argued that such a requirement had a disparate impact on African Americans because "[p]laintiffs' expert found a disparity between African Americans and other employees in [the] number of transfers."  *Id*.  The Sixth Circuit found plaintiffs' disparate impact argument without merit because "[t]he vast majority of transfers were requested by employees themselves[.]"  *Id*.

The Court finds the Sixth Circuit's analysis applicable in this case.  While Plaintiffs were automatically enrolled in the SFH program, they could have chosen to opt out at any time.  *See* doc. 47-44 at PageID 2755-56; doc. 47-64 at PageID 3189.  They did not do so.  Interestingly, Plaintiffs argue that the allegedly disparate impact caused by SFH could have been avoided by simply allowing CSTs to "only participate . . . if they affirmatively opt[ed] in[.]"  Doc. 57 at PageID 3652.  Plaintiffs make no substantive argument as to why an "opt in" program, as opposed to the current "opt out" program, would have lessened the allegedly discriminatory impact in the absence of any evidence that any Plaintiff would have chosen not to opt in.

Regardless, while the Court recognizes the argument implied by Plaintiffs -- *i.e.*, that SFH was not truly optional because it required an affirmative act to avoid its alleged discriminatory consequences -- the undersigned finds any such distinction is without difference for two reasons.  First, Plaintiffs point to no evidence that they were unaware of the option to opt out of SFH.  Second, Plaintiffs point to no evidence that they availed themselves of the mechanism for opting out of SFH and were denied.

Accordingly, the Court finds that Plaintiffs cannot base a disparate impact claim upon participation in a program they could have opted out of.  *Cf. Bacon*, 370 F.3d at 578.

## V.

For all of the foregoing reasons, TWC's motions for summary judgment are **GRANTED**.  TWC's motion to strike the testimony of Dr. Stock (doc. 48) is **DENIED** as moot.  The Clerk is **ORDERED** to **TERMINATE** this case on the Court's docket.

**IT IS SO ORDERED.**

Date:   December 15, 2015               *s/ Michael J. Newman*

Michael J. Newman
United States Magistrate Judge